In re: **ENVIRODYNE INDUSTRIES, INC., et al., Debtors.**

**Bankruptcy Nos. 93 B 310, 93 B 312 through 93 B 316 and 93 B 318 through 93 B 319.**

United States Bankruptcy Court, N.D. Illinois, E.D.

March 3, 1993.

Peter Darrow, Deborah M. Buell, James
E. Millstein, Shari Siegel and Daniel Convi-

sor of Cleary, Gottlieb, Steen & Hamilton, New York City, for debtors.

Dean C. Harvalis and Kathryn Gleason, of U.S. Trustee's Office, Chicago, IL, for U.S. Trustee's Office.

Allan Sweig of Altheimer & Gray, Chicago, IL, for Unofficial Committee of Holders of 13½% Junior Subordinated Notes.

## MEMORANDUM OPINION AND ORDER NO. 52.

JOHN D. SCHWARTZ, Chief Judge.

"We take as our starting point Lord Herschell's remark to Sir George Jessel: '[I]mportant as it was that people should get justice, it was even more important that they should be made to feel and see that they were getting it.'"[1]

The matter before the court arises from two motions: (i) "Motion Of The Unofficial Committee of 13½% Noteholders to Vacate Order Pursuant To Section 327(a) Of The Bankruptcy Code [("Code")][2] Authorizing The Employment Of Cleary, Gottlieb, Steen & Hamilton As Attorneys For Debtors In Possession And To Disqualify Counsel" ("Unofficial Committee's Motion"); and (ii) "Motion To Reconsider Order Authorizing The Employment And Retention of Cleary, Gottlieb, Steen & Hamilton As Attorneys For The Debtors" ("Trustee's Motion") filed by United States Trustee ("Trustee"). The court has heard evidence, statements and arguments of counsel, and has considered the motions, responses, exhibits, affidavits, and memoranda filed by the parties in support of their respective positions. For the reasons set forth below, the court vacates Order No. 4 entered January 7, 1993 authorizing Debtors' employment of Cleary, Gottlieb, Steen & Hamilton ("Cleary, Gottlieb") and denies the Debtors' application to employ Cleary, Gottlieb on a general retainer pursuant to § 327(a).

## BACKGROUND

Sandusky Plastics, Inc. ("Sandusky"), Sandusky Plastics of Delaware ("Sandusky Delaware"), Inc., Viskase Corporation ("Viskase"), Viskase Holding Corporation ("Viskase Holding"), Viskase Sales Corporation ("Viskase Sales"), Clear Shield National, Inc., ("Clear Shield") and Envirodyne Finance Company ("Envirodyne Finance") are wholly owned subsidiaries of Envirodyne Industries, Inc. ("Envirodyne"). These companies are part of an international organization which includes numerous interrelated businesses that manufacture and supply cellulosic casings, shrinkable plastic bags and plastic film and plasticized polyvinyl chloride films for the packaging of food products, plastic containers for packaging of food and other products, and plastic flatware, drinking straws and disposable dining kits.

In 1988, Salomon Brothers, Inc. ("Salomon") retained Cleary, Gottlieb to represent Salomon and others in the proposed leveraged buy-out of Envirodyne ("LBO"). Cleary, Gottlieb subsequently served as counsel to Salomon, and to Emerald Acquisition, Inc. ("Emerald") and Emerald Sub, the acquiring companies, in all phases of the 1989 LBO. This included (i) the negotiation of a bank credit facility with various financial institutions and Continental Bank, N.A.; (ii) the issuance of senior subordinated variable rate notes tendered to Salomon and other institutional investors, the proceeds of which were used to fund the purchase of Envirodyne's then outstanding shares of common stock; and (iii) the merger of Emerald Sub into Envirodyne. See Supplemental Declaration Of Proposed Attorney And Disclosure Statement Pursuant To Bankruptcy Code Sections 327 And 504 And Bankruptcy Rules 2014(a) And 2016(b) ("Second Millstein Affidavit"), ¶ 5. As a result of the LBO, Emerald owns 100% of Envirodyne's common stock. Salomon

---

**1.** 2 J.B. Atlay, *Victorian Chancellors* 460 (1908), *cited in Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088 (3d Cir.1976) (addressing, in a case not unlike the one presently before the court, the eligibility of an attorney to be counsel to plaintiff class representative in a class action).

**2.** 11 U.S.C. § 101 et seq. All section references are to the Bankruptcy Code unless otherwise noted.

Brothers Holding Company ("SBHC"), a wholly owned subsidiary of Salomon, owns 64% of Emerald's stock and has majority representation on the Board of Directors of Envirodyne (four of seven seats).

Since the completion of the LBO, Cleary, Gottlieb has acted as general outside counsel to Envirodyne and its subsidiaries. It has counseled Envirodyne on matters including mergers and acquisitions, securities, tax, and environmental issues. (Second Millstein Affidavit, ¶ 6.) In particular, Cleary, Gottlieb advised Envirodyne in connection with the issuance of the Envirodyne Senior Discount Notes due 1997 and the 14% Senior Subordinated Debentures due 2001. Salomon, represented by Sonnenschein, Carlin, Nath & Rosenthal, was the underwriter in these offerings. (Second Millstein Affidavit, ¶ 6.)

On November 22, 1991, Salomon loaned Envirodyne $5.6 million for general corporate purposes which is evidenced by a 11.25% pay in kind note due 1995. (Trustee's Motion ¶ 11.) In February 1992, Envirodyne suspended payment of interest on the 14% Debentures and 13½% Notes. Cleary, Gottlieb began counseling Envirodyne on its debt restructuring as well as the consequences of seeking protection under chapter 11 of the Code. (Second Millstein, ¶ 4.)

During this time, an Ad Hoc Bondholders Committee formed to negotiate the terms of restructuring Envirodyne's indebtedness. The Bondholder's Committee employed counsel who were paid by Envirodyne to, among other things, investigate the merits of potential creditors' rights actions arising out of the acquisition of Envirodyne, including potential fraudulent conveyance claims against the former shareholders of Envirodyne, Salomon and the other shareholders of Emerald. During the course of the prepetition negotiations, "Cleary, Gottlieb advised Salomon and oth-

er shareholders of Emerald to seek and retain separate counsel to represent them in connection with these alleged potential claims." (Second Millstein Affidavit, ¶ 8.) [3] Cleary, Gottlieb has maintained an ongoing relationship with Salomon in matters unrelated to Envirodyne.

Despite nearly a year of negotiations, the bondholders, lenders and Envirodyne were unable to reach a consensus regarding the refinancing of Envirodyne. On January 6, 1993, certain holders of Envirodyne 13% Junior Subordinated Notes [4] filed an involuntary petition against Envirodyne under chapter 11 of the Code (93 B 310). On January 7, 1993, Envirodyne, Sandusky, Sandusky Delaware, Viskase, Viskase Holding, Viskase Sales, Clear Shield, and Envirodyne Finance (collectively "Debtors") commenced voluntary chapter 11 proceedings. Since the commencement of these cases, the Debtors have remained in possession of their respective properties and have continued to manage and operate their businesses as debtors-in-possession pursuant to § 1107(a) and § 1108 of the Code. All of the cases are being jointly administered for procedural purposes only.

Among the several first day motions filed by the Debtors was an "Ex Parte Motion Of Debtor For An Order Pursuant To Section 327(a) Of The Bankruptcy Code Authorizing The Employment And Retention Of Cleary, Gottlieb, Steen & Hamilton As Attorneys For Debtors–In–Possession" ("*Ex Parte* Motion"). In the *Ex Parte* Motion, the Debtors requested authorization to "employ and retain Cleary Gottlieb as its [sic] attorney under a *general retainer* to perform the extensive legal serves that will be necessary during this chapter 11 case...." (*Ex Parte* Motion, ¶ 4 (emphasis added)). The basis of the *Ex Parte* Motion is that the services of attorneys under a general retainer "are necessary *to enable the Debtors to execute faithfully*

---

**3.** In paragraph 3 of their Memorandum in opposition to the Committee's motion, Cleary Gottlieb states that it became Envirodyne's general outside counsel on May 3, 1989 and "thereafter has refrained from representing Solomon on any matters relating to Envirodyne." Although this does not contradict the Second Millstein Affidavit, these statements do not jive. It was

not until February 1992 that Cleary, Gottlieb advised Salomon, et al. to secure other counsel.

**4.** Hereinafter, "Unofficial Committee." This is the group of 13½% noteholders who objected to Cleary, Gottlieb's employment. It has not been designated as an official committee.

*their duties as debtors in possession."* (*Ex Parte* Motion, ¶ 6 (emphasis added)). Attached to the *Ex Parte* Motion is a F.R.Bankr.P. 2014 affidavit of disinterestedness ("First Millstein Affidavit") sworn to by James E. Millstein, one of over 400 attorneys with Cleary, Gottlieb. (Pertinent provisions of this affidavit are attached as Schedule A.)

When Mr. Millstein presented the *Ex Parte* Motion in open court pursuant to Local Rule 12, counsel for the Unofficial Committee asserted that Cleary, Gottlieb was not "disinterested" as mandated by § 327(a) of the Code. The issue of Cleary, Gottlieb's disinterestedness arose as a result of that law firm's representation of Salomon which is itself, or through a wholly owned subsidiary, involved with the Debtor Envirodyne. Counsel argued that Cleary, Gottlieb's attorney-client relationship with Salomon renders Cleary, Gottlieb ineligible for employment pursuant to § 327(a). Mr. Millstein responded that Cleary, Gottlieb had represented Salomon, but that its representation currently is limited to matters unrelated to these bankruptcy cases. On January 7, 1993, the court entered an "Order Pursuant To Section 327(a) Of The Bankruptcy Code Authorizing the Employment And Retention Of Cleary, Gottlieb, Steen & Hamilton As Attorneys For Debtors In Possession" ("Order No. 4") tendered by Cleary, Gottlieb. However, in view of the assertions on behalf of the Unofficial Committee, the court stated that Order No. 4 would be subject to reconsideration upon appropriate written motion. The court then invited Mr. Millstein, on behalf of Cleary, Gottlieb, to file an affidavit complying with the applicable rules and setting forth Cleary, Gottlieb's relationship to the creditors of the Debtors and any other party in interest.

On January 15, 1993, Cleary, Gottlieb filed the Second Millstein Affidavit. (Pertinent provisions of this affidavit are at-

tached as Schedule B.) Salomon's status as substantial creditor and owner of Envirodyne is evidenced by information which, although absent from the First Millstein Affidavit, is contained in the Second Millstein Affidavit.[5] The Second Millstein Affidavit addresses the above described relationship between Emerald, Envirodyne, and Salomon, and Cleary, Gottlieb's role as legal advisor to all of these entities. The Second Millstein Affidavit additionally reveals that Salomon is a "significant client" of Cleary, Gottlieb.

On January 21, 1993, the Unofficial Committee filed its written motion objecting to Cleary, Gottlieb's employment. On February 2, 1993, the Trustee filed its Motion to reconsider Order No. 4 and Cleary, Gottlieb filed the "Debtors' Memorandum Of Law In Opposition To Motion For Reconsideration Of The Order Authorizing Retention of Cleary, Gottlieb, Steen & Hamilton Pursuant To Section 327(a)" ("Cleary, Gottlieb's Memorandum"). Late on February 9, 1993, the Unofficial Committee filed its Reply to Cleary, Gottlieb's Memorandum. On February 10, 1993, the court conducted a hearing and heard the evidence and arguments of counsel on the issue of Cleary, Gottlieb's eligibility for employment as the Debtor's counsel under a general retainer. The court took this matter under advisement and requested Mr. Millstein and all Cleary, Gottlieb attorneys to refrain from participating in any respect in the formulation of a plan of reorganization for the Debtors.

The Unofficial Committee contends that Cleary, Gottlieb has irreconcilable conflicts by reason of its long-standing and multiple ties to Salomon, particularly ties stemming from the 1989 leveraged buy-out of Envirodyne. The Unofficial Committee argues that Cleary, Gottlieb holds an adverse interest to the bankruptcy estate because Salomon, a creditor of Envirodyne, is a longstanding client. Specifically, it con-

---

5. *See, infra* at 1020 (discussing Cleary, Gottlieb's failure to satisfy the disclosure requirement of F.R.Bankr.P. 2014). The First Millstein Affidavit included the usual boilerplate:

"Cleary, Gottlieb does not represent any creditors or any other party-in-interest or their

respective attorneys in any matter adverse to the Debtors, but in the ordinary course of the practice of law has in the past represented, and now and likely in the future will represent, creditors of Debtors in matters unrelated to this case." (Millstein Affidavit, ¶ 5.)

tends that Cleary, Gottlieb "is not disinterested as a result of (i) its role in the LBO as counsel to Salomon, Emerald, and Emerald Sub; (ii) its role as general counsel to the Debtors and its participation, as issuer's counsel, in the bond offerings used to repay LBO-related debt owed to Salomon, (iii) its admitted inability to investigate claims relating to the LBO and (iv) its continuing "significant client" relationship with Salomon." (Unofficial Committee's Motion, ¶ 12). The Trustee objects to Cleary, Gottlieb's employment "on the basis that its extensive representation of Salomon, a creditor and party in interest in these proceedings, creates an actual conflict of interest in violation of Section 327(c) of the Code." (Trustee's Motion, ¶ 13.)

█ In response to the court's inquiry regarding Cleary, Gottlieb's mechanism for determining conflicts within the firm, Mr. Millstein responded that the firm utilizes a computerized conflict check system.[6] The Debtors, by virtue of being debtors-in-possession under § 1107 and § 1108, were new clients of Cleary, Gottlieb as of the commencement of these bankruptcy cases. Nevertheless, Cleary, Gottlieb apparently failed to conduct a conflicts check prior to submitting the First Millstein Affidavit. As Mr. Millstein stated in open court, Cleary, Gottlieb's routine conflicts check would have, at a minimum, brought out the firm's ongoing relationship with Salomon. Nevertheless, Cleary, Gottlieb's responsive memorandum to the motions states

> "[t]he Dissident Bondholders' [Unofficial Committee's] motion is ... based upon its unfounded notion that Cleary's [Cleary, Gottlieb's] continuing representation of Salomon in matters totally unrelated to this case would compromise its representation of the Debtors ... the

contention ... is wholly speculative and clearly insufficient to deny Envirodyne the right to be represented by its chosen counsel." (Cleary, Gottlieb Memorandum, at 3.)

In support of this assertion, Cleary, Gottlieb maintains that *"neither Cleary nor Envirodyne* have ever viewed the firm's prior representation of Salomon in connection with the Acquisition [of Envirodyne] or continuing representation of Salomon on unrelated matters as undermining its ability to vigorously represent Envirodyne's interests." (Cleary, Gottlieb Memorandum, at 3 (emphasis added)). In its Memorandum, Cleary, Gottlieb suggests that the Unofficial Committee has the burden of proving Cleary, Gottlieb's lack of disinterestedness by contending that "the Dissident Bondholders [Unofficial Committee] have failed to put forth even a scintilla of evidence that Cleary has or will fail to act in the best interests of the Debtors or their estates at any time during these proceedings." (Cleary, Gottlieb Memorandum, at 8.). Cleary, Gottlieb agrees that it would be inappropriate to represent the Debtors in a lawsuit arising out of the LBO,[7] but argues that the likelihood of such a suit is too speculative to warrant Cleary, Gottlieb's disqualification. (Cleary, Gottlieb Memorandum, at 12). Finally, Cleary, Gottlieb believes that the interests of Salomon and the Debtors are parallel rather than conflicting and therefore, it's continuing representation of Salomon is not relevant to its ability to represent the Debtors under a general retainer.

On February 10, 1993, Mr. J.S. Corcoran, Senior Vice President and Chief Financial Officer of Envirodyne, verified Salomon's status as a creditor of Envirodyne and established that the total outstanding obli-

---

6. It is questionable whether the practice of requesting a clerk to run a computerized conflict check is sufficient. The court is aware that, in addition to the computer checks, the daily practice of many firms is to circulate a new matters list and require each attorney to evaluate whether he or she knows or is aware of conflicts prohibiting the firm's representation as described in the memo.

7. If, in fact, the burden of proving lack of disinterestedness was ever on the Unofficial Committee, this burden was satisfied merely by reference to the statement in Cleary, Gottlieb's Memorandum that the firm could not investigate or represent the Debtors in a lawsuit arising out of the LBO. (Cleary, Gottlieb, at 10.) Certainly it is inappropriate for counsel to seek to be generally retained by a client when counsel is aware at the start of its representation that it cannot fully represent that client.

gation is in excess of $41 million. He testified that he has discussed Cleary, Gottlieb's concurrent representation of Envirodyne and Salomon with a partner of Cleary, Gottlieb, and he has consented to this dual representation. Mr. Corcoran never made representations that the Debtor Envirodyne would or would not sue Salomon. Nevertheless, the court notes that Mr. Corcoran's testimony, although credible, was devoid of any indication that he had been counseled as to a debtor-in-possession's fiduciary obligations arising under § 1107. Mr. Corcoran indicated that he had been made aware that Cleary, Gottlieb's employment as counsel for the Debtors might be challenged. He did not testify what the basis of such challenge might be or when he came into possession of this knowledge.

### DISCUSSION

■ The primary issue before the court is whether Cleary, Gottlieb's past and present attorney-client relationship with Salomon including Cleary, Gottlieb's role in the LBO, coupled with Salomon's status as both a majority shareholder of the Debtor's parent company and a creditor of the Debtor Envirodyne renders the firm ineligible for employment under § 327. The Rules of Professional Conduct as adopted by the Northern District of Illinois are relevant to this determination. This analysis must also address whether Cleary, Gottlieb's failure to comply with the disclosure requirements of F.R.Bankr.P. 2014(a) automatically results in Cleary, Gottlieb's disqualification.[8]

#### Section 327(c) Is Not Applicable

Section 1107(a) of the Code provides that a debtor-in-possession has all of the rights (other than the right to compensation) and obligations of a trustee in a bankruptcy case "subject to any limitations on a trustee ... and to such limitations as the court prescribes." Section 327 governs the employment of professional persons by the

trustee. This section, in relevant part, provides

(a) Except as otherwise provided in this section, the trustee, with the court's approval may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

.     .     .     .  .     .

(c) In a case under chapter 7, 12 or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

The issues of "disinterestedness" and whether Cleary, Gottlieb represents or holds and adverse interest do not arise solely because Cleary, Gottlieb maintains an ongoing relationship with a creditor of the estate. If this were true, § 327(c) would control and the court would not have the authority to disqualify Cleary, Gottlieb without determining that an actual conflict exists.

However, § 327(c) is not applicable to this case. The operative word in this subsection is "solely." Salomon's present relationship to the Debtor Envirodyne stems from (i) Salomon's role as underwriter for the Envirodyne Senior Discount Notes due 1997 with total face amount outstanding of approximately $250 million (ii) Salomon's role as underwriter for the 14% Senior Subordinated Debentures due 2001 with a total principal amount outstanding of approximately $200 million (iii) Salomon's $5.6 million loan to Envirodyne for general corporate purposes on November 22, 1991 as evidenced by a 11.25% pay in kind note due 1995; and (iv) the fact that Salomon holds four of the seven positions of the Board of Directors of Envirodyne and is the owner

---

**8.** Violations of § 327 standards or F.R.Bankr.P. 2014(a) disclosure requirements or the Rules of Professional Conduct, alone, may be sufficient to deny all compensation. *See In the Matter of*

*Grabill Corp.,* 983 F.2d 773 (7th Cir.1993). The court, however, reserves the issue of Cleary, Gottlieb's compensation to a later date.

of 64% of the stock of Emerald which owns 100% of the stock of Envirodyne. (Trustee's Motion, ¶ 11.) In sum, Cleary, Gottlieb represents a party who is not only a creditor to the extent of $41 million, but is also, through a wholly-owned subsidiary, an equityholder and a party to the LBO that must be investigated.

Even assuming the applicability of § 327(c), the court agrees with the Trustee that an actual, rather than a potential, conflict exists. In light of the Code's concern for maintaining the integrity of the bankruptcy process, the estate's potential claim against Salomon need not become a live claim for an actual conflict to exist. Some actual potential conflicts merit disqualification because the likelihood of injury to the bankruptcy process is great. Here, it is undisputed that Cleary, Gottlieb represented both entities in a lender/borrower relationship at some time prior to the commencement of the chapter 11 case. Thus, should any problem arise between Envirodyne and Salomon, Cleary, Gottlieb could not investigate nor participate in litigation on behalf of any party.[9]

■ Cleary, Gottlieb acknowledges this fact but suggests that any conflict that may have existed was cured when the firm advised Salomon to retain other counsel in connection with matters relating to Envirodyne. (Cleary, Gottlieb Memorandum, at 8., Second Millstein Affidavit, ¶ 8.) This argument is faulty. Salomon retained Cleary, Gottlieb in connection with the Envirodyne LBO. The required unwinding of the LBO accounts for the commencement of these bankruptcy proceedings. The LBO forms the basis of potential claims which impact the administration of the bankruptcy estate and will presumably affect the contents of any proposed plan of reorganization. The assertion that Cleary, Gottlieb's past representation of Salomon is unrelated to these cases is erroneous.

■ Without hesitation, this court finds that Cleary, Gottlieb's representation of the Debtors on a general retainer constitutes an actual conflict forbidden by the Code.

*Representing An Adverse Interest and "Nondisinterestedness" Are Overlapping Prongs Of § 327(a)*

Since § 327(c) is not relevant to this case, a determination of Cleary, Gottlieb's eligibility to be employed as the Debtors' counsel under a general retainer turns on application of the standards set forth in § 327(a). Section 327(a) authorizes the trustee, here debtor-in-possession, to employ professionals who are (i) disinterested persons (ii) that do not hold or represent an interest adverse to the estate. This two-prong standard for employment of professionals results, in part, from the common fund nature of bankruptcy estates and from past problems associated with attorney employment and compensation. See H.Rep.No. 595, 95th Cong., 2d Sess. 92, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6053. The adverse interest and "disinterested person" limitations set forth in § 327(a) represent the congressional intention to hold professionals performing duties for the estate to strict fiduciary standards. This section is plainly concerned with a professional's divided loyalties and ensuring that professionals employed by the estate have no conflicts of interest with the estate. If the professional sought to be employed does not satisfy one prong of this standard, the Code prohibits the court from authorizing his or her employment. Section 327 does not allow these limitations to be excused by waiver. *In re Amdura*, 121 B.R. 862, 866 (Bankr.D.Colo.1990).

■ The term "adverse interest" is not defined by the Code. However, by judicial definition, "to hold an adverse interest" means (i) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (ii) to possess a predisposition un-

---

**9.** *See* Rules of Professional Conduct of the Northern District of Illinois, Rule 1.9 and Comments.

der circumstances that render such bias against the estate. *In re American Printers,* 148 B.R. 862 (Bankr.N.D.Ill.1992); *In re Tinley Plaza Assoc., Inc.,* 142 B.R. 272, 276–77 (Bankr.N.D.Ill.1992); *In re Al Gelato Continental Desserts, Inc.,* 99 B.R. 404, 407 (Bankr.N.D.Ill.1989); *In re Roberts,* 46 B.R. 815, 827 (Bankr.D.Utah 1985). To "represent an adverse interest" means to serve as agent or attorney for any individual or entity holding such an adverse interest. *In re Tinley Plaza Assoc.,* 142 B.R. at 277; *In re Roberts,* 46 B.R. at 827.

■ Unlike adverse interest, a "disinterested person" is defined in § 101(14).[10] Section 101(14)(E) provides that a "disinterested person" includes one that "does not have an interest materially adverse to the interest of the estate ... by reason of any direct *or indirect* relationship to, connection with, or interest in, the debtor ... or for any other reason." (emphasis added). This provision overlaps with the requirement that counsel for a debtor-in-possession not represent an interest adverse to the estate. *In re Tinley Plaza Assoc.,* 142 B.R. at 277. The court reads § 101(14)(E) as a guideline for determining what conflicting representations are prohibited by the Code. This approach is buttressed by case law which refers to a disinterested person as one who is "free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate." *See, e.g., In re American Printers,* 148 B.R. 862; *In re Tinley Plaza,* 142 B.R. at 277. Along the same lines, Collier states:

10. Section 101(14) reads "[a] "disinterested person" means person that—
(A) is not a creditor, an equity security holder, or an insider;
(B) is not and was not an investment banker for any outstanding security of the debtor;
(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of a security of the debtor;
(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph;

As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might in view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality during the administration of the case. *Collier on Bankruptcy,* ¶ 327.03, 327–22 (L.King ed. 1985).

Thus, an attorney who represents a debtor-in-possession while also representing a party-in-interest in unrelated matters is disqualified only if such representation of the party in interest puts the attorney in a position where he or she has a conflict of interest i.e. when such client has an interest adverse to the estate, then such attorney is no longer considered disinterested.

■ Courts must consider the disqualification issue on a case-by-case basis in order to reach a fair result. *In re Martin,* 817 F.2d 175, 182 (1st Cir.1987) (finding that disqualification analysis is case specific); *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1256 (5th Cir.1986). Further, if one attorney with a law firm is ineligible to represent a debtor-in-possession, then that firm is disqualified from such representation. *In re Tinley Plaza,* 142 B.R. at 277 (citing *In re Philadelphia Athletic Club, Inc.,* 20 B.R. 328, 338 n. 11 (E.D.Pa.1982); *see also* Rules of Professional Conduct for the Northern District of Illinois, Rule 1.10(a) (N.D.Ill.1991).[11] The 400 plus attorneys at Cleary, Gottlieb must be considered as one in any conflict of

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph or for any other reason;

11. Rule 1.10, addressing the issue of imputed disqualification, states
(a) No lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with that firm would be prohibited from doing so by Rules 1.7 ...

**1018**

interest analysis.[12]

*Application of § 327(a) To This Case*

▮ There are several factual bases which may require Cleary, Gottlieb's disqualification. The Cleary, Gottlieb Memorandum independently addresses each ground. First, Cleary, Gottlieb contends that the firm's continued representation of Salomon in unrelated matters does not mandate its disqualification under § 327(a). In support, Cleary, Gottlieb cites *In re Dynamark Ltd.*, 137 B.R. 380 (Bankr. S.D.Cal.1991) and the recent case of *In re American Printers*, 148 B.R. 862 (Bankr. N.D.Ill.1992). In *Dynamark*, the court authorized the employment under § 327(a) of counsel who concurrently represented the debtor's largest secured creditor on unrelated matters. The *Dynamark* court employed a balancing approach to arrive at this result, stating that "no actual conflict or adverse interest has surfaced which would outweigh the debtor's right to counsel of his choice." *Dynamark*, 137 B.R. at 381. This court disagrees with the *Dynamark* court's assertion that its conclusion is "consistent with the underlying policies of bankruptcy law." The Code does not authorize a bankruptcy court to weigh the totality of the circumstances when permitting the employment of professionals. Rather, the Code provides guidelines so that the court is not permitted to adopt a balancing approach. If all bankruptcy courts adopted the narrow definition of conflict of interest applied in *Dynamark*, then the Code's conflict of interest barriers would be rendered ineffective and only the most severe and open conflicts would be prohibited.

▮ *Dynamark* is inconsistent with § 327(a). It is clear that the standards of § 327(a) are to be strictly construed due to the unique nature of the bankruptcy system. *See, e.g., Tinley Plaza*, 142 B.R. at 277 (citing *In re Michigan General Corp.*, 78 B.R. 479, 484 (Bankr.N.D.Tex.1987)).

Multiple representations which may be tolerable in a commercial setting after full disclosure are not permissible in the bankruptcy setting. Upon the commencement of a chapter 11 proceeding, a debtor continues to operate its business pursuant to 1107 and 1108 of the Code, but assumes fiduciary duties and obligations to all parties in interest without fear or favor. The prepetition debtor does not have many of these postpetition obligations. It is mandatory that Debtors' counsel be able to act in the best interests of the bankruptcy estate, free of any prior or ongoing commitments.[13] Because of these limitations, a chapter 11 debtor does not have an absolute right to counsel of its choice.

▮ In *American Printers*, a bankruptcy court in this district disqualified the law firm from representing the debtor-in-possession due to its ongoing representation of a creditor in unrelated matters. The creditor, a bank, was a substantial client of the law firm. Despite the parties' agreement that the firm had not acted adversely to the estate's interests, the court recognized the law firm's interest in maintaining good relations with the bank and found this interest to constitute a disqualifying conflict of interest. Judge Schmetterer based the *American Printers* decision, in part, on the reasoning in *In re Amdura Corp.*, 121 B.R. 862 (Bankr. D.Colo.1990). In *Amdura*, a firm seeking to be employed as debtor's counsel represented the debtor's primary secured lender on an ongoing basis in matters unrelated to the bankruptcy case. The debtor commenced the bankruptcy case as result of its inability to reach an accommodation with the lender. A partner of the firm testified that other counsel would have to be employed to investigate and prosecute a potential suit against the lender because the firm would not "bite the hand that feeds it." *In re Amdura*, 121 B.R. at 867. During the February 10 hearing, Mr. Millstein

---

**12.** The following inquiry is appropriate: may the partner at Cleary, Gottlieb, who is in charge of representing Salomon, act as the Debtors' representative in the negotiation of the Debtors' plan of reorganization?

**13.** See 11 U.S.C. § 323 which provides that the role of trustee or debtor in possession is to serve as representative of the estate.

argued that the facts in this case do not justify disqualifying Cleary, Gottlieb because, unlike the creditor in *Amdura*, Salomon is not the primary secured creditor in this case. Mr. Millstein apparently believes that the *relative* size of the creditor's claim vis-a-vis the estate's total debt is necessarily relevant to whether Debtors' counsel may continue to maintain a relationship with that creditor without violating the tests of § 327(a).

Counsel's argument is not persuasive. The key issue is whether the firm's interest in maintaining the client relationship with Salomon, a substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality. The *Amdura* opinion correctly focuses on the law firm's ability to act impartially as the debtor's representative in all matters. The court in *Amdura* does not consider the relative size of the creditor's claim in a vacuum, but in conjunction with the creditor's status as a major client of the firm. *Amdura*, 121 B.R. at 869.

The court must remain cognizant of the fact that Salomon is an insider, a 64% owner, and a substantial creditor of the Debtor Envirodyne. The negotiation of a plan of reorganization likely will necessitate negotiation with Salomon, a "substantial client" of Cleary, Gottlieb. Given these facts in this case, the Debtors' interests and the interests of the creditor body as a whole are not best represented at a negotiation table by a lawyer who faces a substantial client on the other side.[14]

Cleary, Gottlieb additionally refers the court to *In re Nephi Rubber Products Corp.*, 120 B.R. 477 (Bankr.N.D.Ind.1990); *In re Lee Way Holding Co.*, 102 B.R. 616 (S.D.Ohio 1989); *In re Peck*, 112 B.R. 485 (Bankr.D.Conn.1990); *In re West Side Creek Ltd. Partnership*, 93 B.R. 177 (Bankr.E.D.Ark.1988). However, these cases are not applicable because they address the issue of counsel's disqualification due to its *former* representation of a party-in-interest. Here, by Cleary, Gottlieb's own admission, Salomon is a party-in-interest in these bankruptcy cases that remains a "substantial client" of the firm. (Second Millstein Affidavit, ¶ 3.) Also, none of these opinions confront the problem of an attorney seeking to be employed in a case which may require that attorney to negotiate, investigate or sue another client.

Second, Cleary, Gottlieb argues that the firm's representation of Salomon in the LBO does not render Cleary, Gottlieb not disinterested because it has promised that it will not represent the Debtor Envirodyne in the investigation and prosecution of a claim against Salomon. Cleary, Gottlieb further argues that such an action is a "remote contingency." The court does not accept this characterization in light of the debtor-in-possession's affirmative duty to investigate potential claims, regardless of the amount of prepetition investigation and negotiation among parties-in-interest. The statement alone is evidence of a bias and demonstrates Cleary, Gottlieb's already formed belief that Salomon has no liability to the estate arising out of either the LBO or any other set of facts. The court cannot give weight to the argument that potential claims arising out of the LBO are mere speculation when it is made by the firm that acted as counsel to the orchestrator of the LBO.

Third, Cleary, Gottlieb correctly points out that courts have frequently allowed the same counsel to represent both a corporate debtor and the debtor's principals, subsidiaries, sister corporations, parents or majority shareholders in the same bankruptcy. See ROBERT E. GINSBERG & ROBERT D. MARTIN, BANKRUPTCY: TEXT, STATUTE, RULES § 4.03 (3d ed. 1992). By the same token, many courts have found conflicts of interest when attorneys have represented both a debtor-in-possession and the debtor's shareholders. *See, e.g., In re Rusty Jones*, 134 B.R. 321, 343 (Bankr.N.D.Ill.1991) (citing cases). Regardless, the fact situation before the court presents a more complex question than whether counsel may represent both the debtor and a shareholder. The bankruptcy proceeding is an unwinding of the LBO. Cases allowing counsel to

---

14. *See, supra,* note 12.

represent a corporation and shareholder where the sole or majority shareholder incorporated his business and subsequently the shareholder and the corporation commenced separate chapter 11 proceedings are not authority for allowing Cleary, Gottlieb to represent the Debtors.[15] These cases do not concern the reorganization of a "ma and pa" business.

■ Finally, the court declines to follow decisions which address the disinterestedness issue with the benefit of hindsight and focus only on whether an attorney conducted himself or herself in an unbiased fashion up to that point. Some decisions are based on the bankruptcy court's determination that the disruption caused by disqualifying Debtors' counsel outweighs the gravity of the conflict. *See, e.g., In re Dynamark,* 137 B.R. at 380; *In re Federated Dep't Stores, Inc.,* 114 B.R. 501 (Bankr.S.D.Ohio 1990). Yet nowhere does the statute direct the court to consider this "disruption" factor. Given the "Supreme Court's current penchant for literal interpretations of the Bankruptcy Code,"[16] Chapter 11's underlying goal of rehabilitation, which is arguably shared by all parties-in-interest, should not be used to avoid the plain language of the statute.[17] Nevertheless, even weighing the costs of disruption, the court must find that the costs will increase if the court waits until counsel acts without the requisite neutrality before disqualifying counsel.

### Disclosure Requirements

■ The bankruptcy court has the duty to determine a professional's eligibility for employment under the above described standards. The court, however, does not have the resources nor is it the court's duty to affirmatively investigate and seek out conflicting representations by counsel the debtor seeks to employ. In *In re Tinley Plaza,* this court stated "[t]he court has no duty to rummage through files or conduct independent factfinding investigations in order to determine whether prospective attorneys are involved in actual or potential conflicts of interest." *In re Tinley Plaza,* 142 B.R. at 278–79. Moreover, the attorneys have an undisputable ethical obligation to inform the court of the existence of possible ethical violations. For these reasons, the Bankruptcy Rules provide disclosure duties and the requirements necessary to fulfill them. *Rusty Jones,* 134 B.R. at 342; *see* F.R.Bankr.P. 2014(a) and 2016(a) & (b). It is mandatory that professionals seeking to be employed disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and their respective attorneys or accountants in the professional's application for employment after making reasonable inquiry.[18] The burden of disclosure clearly falls

---

**15.** Rule 1.7 of the Rules of Professional Conduct for the Northern District of Illinois is also applicable. Although Rule 1.7 gives the attorney greater leeway than the Code, this rule likely provides an additional ground for Cleary, Gottlieb's disqualification. Rule 1.7(a) provides

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after disclosure. The requisite consents by all parties in interest has not been obtained.

**16.** *In the Matter of Grabill Corp.,* 1993 WL 872 (7th Cir.1993) (citing *Connecticut National Bank v. Germain,* —— U.S. ——, ——–——, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992)); *see also Union Bank v. Wolas,* —— U.S. ——, ——, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991) ("fact that Congress may not have foreseen all of the consequences of a statutory enactment is not suffi-

cient reason for refusing to give effect to its plain meaning").

**17.** This argument is generally used in connection with the judicially created doctrine of necessity. The doctrine of necessity is employed by courts to allow debtors to pay necessary prepetition claims when it is essential to keep the business intact and running. This doctrine is not intended, and has never been applied, to bypass a conflict problem and allow the employment of otherwise ineligible counsel.

**18.** F.R.Bankr.P. 2014 requires that all applications for employment shall state "... to the best of the applicant's knowledge, all of the persons connections with the Debtor, Creditors or any other party in interest, their respective attorneys and accountants. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the Debtor, Creditor or any other party in interest, their respective attorneys and accountants."

on the person "making the statement to come forward with facts pertinent to eligibility and to make, candid and complete disclosure." *In re Peoples Sav. Corp.*, 114 B.R. 151, 154 (Bankr.N.D.Ill.1990). F.R.Bankr.P. 2014(a) leaves an attorney with no discretion to choose what connections are relevant or trivial to a § 327(a) analysis and should or should not be disclosed. No matter how trivial a connection appears to the professional seeking employment, it must be disclosed. *In re EWC*, 138 B.R. 276, 281 (Bankr.W.D.Okla.1992).

The duties imposed on professionals seeking employment under § 327(a) are to a degree self-policed. The Code and case law set forth consequences for violation of these self-policed requirements. Failure to abide by the disclosure requirements is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections were material or *de minimis. See, e.g., In re EWC, Inc.*, 138 B.R. at 279; *In re Saturley*, 131 B.R. 509, 517 (Bankr.D.Me.1991); *In re Tinley Plaza*, 142 B.R. at 276; *In re BH & P, Inc.*, 103 B.R. 556 (Bankr.D.N.J. 1989); *In re Lee*, 94 B.R. 172, 177 (Bankr. D.Cal.1988). Apart from a finding of disinterestedness, strict compliance with the disclosure requirements is necessary to maintain the integrity of the bankruptcy system.

Without much consideration, a comparison of the Millstein affidavits establishes Cleary, Gottlieb's disregard of its disclosure obligation under F.R.Bankr.P. 2014(a). The *Ex Parte* Motion declares that "to the best of the Debtors' knowledge, the members and associates of Cleary, Gottlieb do not have any connection with the Debtors, their creditors or any other party-in-interest or any other respective attorneys except as set forth herein and in the annexed declaration ..." The First Millstein Affidavit revealed merely that Cleary, Gottlieb had represented creditors in the past and would likely represent them in the future in matters unrelated to this case.[19]

Cleary, Gottlieb did not come forth with information regarding its involvement with Salomon on its own accord. It was not until counsel for the Unofficial Committee had challenged Cleary, Gottlieb's eligibility to be employed as the Debtors' counsel under a general retainer that Cleary, Gottlieb revealed its connection with Salomon and Salomon's relationship to the Debtor Envirodyne. Without this challenge, the court cannot say with certainty that Cleary, Gottlieb ever would have revealed these connections. Cleary, Gottlieb explains its failure to disclose its relationship with Salomon by asserting that neither the firm nor the Debtors have ever viewed Cleary, Gottlieb's representation of Salomon as undermining its ability to vigorously represent the Debtors. Cleary, Gottlieb points to the nature of the prepetition negotiations as evidence of this neutrality. However, the examiner of this conflict of interest and the relevant time period examined are incorrect. It is the court's role, not Cleary, Gottlieb's, to determine whether a disqualifying conflict of interest exists. This determination cannot be made prior to the commencement of the case. For the purposes of employing counsel, the debtor-in-possession is a new entity with fiduciary duties and obligations mandated by the Code. Whether Cleary, Gottlieb vigorously represented these Debtors prepetition is not this court's concern nor is it relevant to Cleary, Gottlieb's ability to act in compliance with the provisions of the Bankruptcy Code and the Rules.

## CONCLUSION

The Debtors, as debtors-in-possession, the creditor body and other parties in interest cannot be made "to feel and see that they are getting [justice]" through Cleary, Gottlieb's employment on a general retainer under § 327(a). Cleary, Gottlieb is attempting to serve two masters. Although the court does not question Cleary, Gottlieb's representation in obtaining post-petition financing for the Debtors, the court must recognize that Cleary, Gottlieb has an important economic interest in maintaining good relations with Salomon, a substantial

---

**19.** *See, supra* at note 5.

client. Salomon also has an important economic interest in obtaining the best possible deal out of this reorganization. This alone bars Cleary, Gottlieb from acting as the Debtors' counsel under a general retainer. Entry of Order No. 4 was not consistent with the requirements of the Code, F.R.Bankr.P. 2014(a), and the Rules of Professional Conduct. The court would not have entered Order No. 4 had the court had all the pertinent facts before it.

NOW, THEREFORE, IT IS ORDERED THAT Order No. 4 is vacated and the Debtor's application to employ Cleary, Gottlieb pursuant to § 327(a) is denied.

## SCHEDULE A

### PERTINENT PROVISIONS OF FIRST MILLSTEIN AFFIDAVIT

"2. Neither Cleary Gottlieb nor any member or associate thereof, insofar as I have been able to ascertain, has any connection with the Debtors in these cases, their creditors, or any other party-in-interest herein, or their respective attorneys, except as hereinafter set forth."

"3. Cleary Gottlieb has served as counsel to Envirodyne Industries, Inc. ("Envirodyne") since August, 1989. Cleary Gottlieb has also served in a similar capacity for various of Envirodyne's affiliates during the same period."

"5. Cleary Gottlieb does not represent any creditors or any other party-in-interest or their respective attorneys in any matter adverse to the Debtors, but in the ordinary course of the practice of law has in the past represented, and now and likely in the future will represent, creditors of Debtors in matters unrelated to this case."

## SCHEDULE B

### PERTINENT PROVISIONS OF SECOND MILLSTEIN AFFIDAVIT

"2. As set forth in my Declaration, dated January 7, 1993, Cleary, Gottlieb has from time to time prior to the commencement of these cases represented creditors and interest holders of the estate in matters unrelated to the matters on which Cleary Gottlieb has been retained to represent the estate in connection with these proceedings. A list of the known parties in interest for whom Cleary, Gottlieb has performed such services is set forth on Exhibit A to this Declaration."

"3. Among such clients of the firm who are also parties in interest in these proceedings is Salomon Inc. and certain of its affiliates (collectively, but excluding Emerald Acquisition Corp., "Salomon"). Salomon is a significant client of Cleary, Gottlieb. Salomon is also a creditor of Envirodyne Industries, Inc. ("Envirodyne") and is the majority shareholder of Emerald Acquisition Corp. ("Emerald"), the sole shareholder of Envirodyne. Emerald's other shareholders are D.P. Kelly & Associates L.P., ARTRA Group Incorporated ("Artra"), and Continental Illinois Equity Corporation."

"4. Cleary, Gottlieb's relationship with Envirodyne derived from its initial retention in 1988 by Salomon and, once formed Emerald and Emerald Sub One Inc. ("Emerald Sub"), a wholly-owned subsidiary of Emerald, in connection with (a) the formation of Emerald and Emerald Sub (including the issuance of Emerald Common Stock to its initial shareholders including Salomon Brothers Holding Company, Inc.), (b) Emerald Sub's tender offer in March, 1989 for all of the then issued and outstanding common stock of Envirodyne and (c) the subsequent merger in June, 1989 of Emerald Sub with and into Envirodyne (the tender offer and merger, collectively, the "Acquisition"). Pursuant to the merger, Emerald became the sole owner of the outstanding common stock of Envirodyne."

"5. In connection with the Acquisition, Cleary, Gottlieb represented Emerald and Emerald Sub in the negotiation of a bank credit facility with various financial institutions and Continental Bank N.A., as agent for those institutions, and in connection with the issuance of Senior Subordinated Increasing Rate Notes (the "IRNs") to Salomon and other institutional purchasers, the proceeds of each of which were used to fund the purchase of Envirodyne's then outstanding shares of common stock as

part of the Acquisition. Pursuant to the merger, Envirodyne assumed Emerald Sub's obligation to repay amounts outstanding under the bank credit facility and the IRNs."

"6. Since the closing of the tender offer on May 3, 1989, Cleary, Gottlieb has acted as Envirodyne's primary general outside corporate counsel. In this capacity, Cleary, Gottlieb represented Envirodyne in connection with the public offering in August, 1989 of the Senior Discount Notes Due 1997 (the "Senior Discount Notes") and the 14% Senior Subordinated Debentures Due 2001 (the "14% Debentures"), the proceeds of which offerings were used to repay the IRNs. In the public offering of the Senior Discount Notes and 14% Debentures, the underwriters, led by Salomon, were represented by Sonnenschein, Carlin, Nath & Rosenthal. Thereafter, Cleary, Gottlieb's services on behalf of Envirodyne have included, *inter alia*, advice and assistance involving secured and unsecured private and public financings; corporate and securities matters; litigation and tax matters. Cleary, Gottlieb also represented Envirodyne and Viskase Corporation in connection with the negotiation of a lease financing with General Electric Capital Corporation in December, 1990. Beginning in December, 1991, Cleary, Gottlieb also advised Envirodyne with respect to its proposed exchange offer for the 14% Debentures and the 13.5% Junior Subordinated Notes (the "13.5% Notes") and as to certain issues with respect to its debt restructuring and the consequences of, and mechanics of seeking protection under title 11 of the United States Code (the "Bankruptcy Code"). During the one-year period prior to the commencement of these proceedings, Cleary, Gottlieb has received approximately $692,000 in the aggregate in payment for its services in connection with the proposed exchange offers, the restructuring negotiations and the commencement of these proceedings."

"7. In February, 1992, Envirodyne announced that it was suspending payment of interest on the 14% Debentures and the 13.5% Notes. Thereafter, in March, 1992, an Ad Hoc Bondholders Committee (the "Bondholders Committee") was formed to negotiate with Envirodyne over the terms of a restructuring of Envirodyne's indebtedness. On information and belief, the Bondholders Committee is composed of holders of Senior Discount Notes, 14% Debentures and 13.5% Notes. Cleary, Gottlieb was retained by Envirodyne to represent it in connection with these negotiations. In addition, Envirodyne agreed to pay the legal fees and expenses of the Bondholders Committee's counsel, Debevoise & Plimpton and its financial advisor, The Blackstone Group L.P."

"8. During the course of the prepetitions restructuring negotiations, the Bondholders Committee investigated the merits of potential creditors' rights actions related to or arising out of the Acquisition, including potential fraudulent conveyance claims against, *inter alia*, the former shareholders of Envirodyne and Salomon and the other shareholders of Emerald. At that time, Cleary, Gottlieb advised Salomon and the other shareholders of Emerald that it was appropriate for them to seek and retain separate counsel to represent them in connection with these alleged potential claims and that Cleary, Gottlieb as Envirodyne's counsel, could not represent them in this connection. Thereafter, Salomon retained and continues to be represented by Munger, Tolles & Olson, D.P. Kelly & Associates L.P. retained and continues to be represented by Skadden, Arps, Slate, Meagher & Flom, and to the best of my knowledge, Artra retained and continues to be represented by Quiet & Silverman."

## EXHIBIT A

State Street Bank & Trust Co.

Bankers Trust Company

Bank of America Nat'l Trust & Savings Assn.

General Electric Credit Corporation

Salomon Inc and its affiliates

Connecticut Mutual Life Insurance Company

**1024**

Teachers Insurance & Annuity Association

Witco Corporation

Stone Container Corporation

Fina Oil & Chemical Company

Union Carbide Chemicals

Olin Corporation